ORIGINAL

Approved: _____
JUN XIANG / KEVIN MEAD
Assistant United States Attorneys

Before:   THE HONORABLE ROBERT W. LEHRBURGER
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - X
                                  :
UNITED STATES OF AMERICA          :   SEALED COMPLAINT
                                  :
      - v. -                      :   Violations of
                                  :   18 U.S.C. §§ 1028A,
JACOB SAGIAO,                     :   1343, 1349, 1956(h), and
MARYLYNN PENEUETA,                :   2
BRITT JACKSON,                    :
JOSHUA FITTEN,                    :
DONTAE COTTRELL,                  :   COUNTY OF OFFENSE:
ARINZE OBIKA,                     :   NEW YORK
NDUKWE ANYAOGU,                   :
HERMAN BASS,                      :   20 MAG 1546
DAVID URO, and                    :
VICTOR AHAIWE,                    :
                                  :
              Defendants.         :
                                  :
- - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JARED EANNUCCI, being duly sworn, deposes and says
that he is a Task Force Officer with the United States
Attorney's Office for the Southern District of New York and an
Officer with U.S. Customs and Border Protection, and charges as
follows:

                         COUNT ONE
            (Conspiracy to Commit Bank Fraud)
              (Business Email Compromise)

        1.    From at least in or about March 2019 up to and
including at least in or about May 2019, in the Southern
District of New York and elsewhere, JACOB SAGIAO, MARYLYNN
PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE
OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR

1

AHAIWE, the defendants, and others known and unknown, willfully
and knowingly, did combine, conspire, confederate, and agree
together and with each other to commit bank fraud, in violation
of Title 18, United States Code, Section 1344.

        2.   It was a part and an object of the conspiracy
that JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA
FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN
BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and others
known and unknown, willfully and knowingly, would and did
execute and attempt to execute a scheme and artifice to defraud
a financial institution, the deposits of which were then insured
by the Federal Deposit Insurance Corporation, and to obtain
moneys, funds, credits, assets, securities, and other property
owned by, and under the custody and control of, such financial
institution, by means of false and fraudulent pretenses,
representations, and promises, in violation of Title 18, United
States Code, Section 1344.

              (Title 18, United States Code, Section 1349.)

                           COUNT TWO
              (Conspiracy to Commit Money Laundering)
                   (Business Email Compromise)

        3.   From at least in or about March 2019 up to and
including at least in or about May 2019, in the Southern
District of New York and elsewhere, JACOB SAGIAO, MARYLYNN
PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE
OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR
AHAIWE, the defendants, and others known and unknown,
intentionally and knowingly did combine, conspire, confederate,
and agree together and with each other to commit money
laundering, in violation of Title 18, United States Code,
Section 1956(a)(1)(B)(i).

        4.   It was a part and an object of the conspiracy
that JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA
FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN
BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and others
known and unknown, knowing that the property involved in certain
financial transactions represented the proceeds of some form of
unlawful activity, would and did conduct and attempt to conduct
such financial transactions which in fact involved the proceeds
of specified unlawful activity, to wit, wire fraud schemes
involving business email compromises, knowing that the
transactions were designed in whole and in part to conceal or

                               2

disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

COUNT THREE
(Aggravated Identity Theft)

5.    From at least in or about February 2019 up to and including at least in or about May 2019, in the Southern District of New York and elsewhere, VICTOR AHAIWE, the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, AHAIWE controlled and transacted in a bank account of another person, who was deceased, including by using a debit card for that bank account, while holding himself out to be that other person, during and in relation to the bank fraud conspiracy alleged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

COUNT FOUR
(Wire Fraud)
(Romance Fraud)

6.    From at least in or about June 2019 up to and including the present, in the Southern District of New York and elsewhere, BRITT JACKSON, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, JACKSON participated in and received proceeds from an online romance fraud, in which the victim was induced to send money to JACKSON based on false representations, and, in furtherance of such scheme, JACKSON caused an interstate wire to be sent from

3

Pennsylvania to Georgia, which wire was processed through a bank located in New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
(Wire Fraud)
(Fiji Fraud)

7.    From at least in or about October 2018 up to and including at least in or about October 2018, in the Southern District of New York and elsewhere, NDUKWE ANYAOGU, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ANYAOGU participated in and received the proceeds from an email compromise scheme in which a law firm in Fiji was induced to send money to ANYAOGU based on false representations, and, in furtherance of such scheme, ANYAOGU caused an international wire to be sent from Fiji to Georgia, which wire was processed through a correspondent bank located in New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

8.    I am a Task Force Officer with the United States Attorney's Office for the Southern District of New York and an Officer with U.S. Customs and Border Protection.  I have been personally involved in the investigation of this matter.  This affidavit is based upon my investigation, my conversations with law enforcement agents and others, and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4

Overview

9.    From at least in or about March 2019 up to and
including at least in or about May 2019, JACOB SAGIAO, MARYLYNN
PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE
OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR
AHAIWE, the defendants, received, transferred, and sent the
proceeds of two business email compromise schemes (the "BEC
Schemes"), described further below, in which the victims (the
"Victims") were induced to send approximately $4.5 million to
bank accounts controlled by SAGIAO and OBIKA.  In order to
launder the proceeds of the BEC Schemes, the defendants created
bank accounts that listed "d/b/a" names that closely resembled
the names of real companies, so that transfers of proceeds
between and among those bank accounts would appear to be
transactions between real companies.

        a.    In the first BEC Scheme ("BEC-1"), a
technology company ("Victim-1") was induced to send
approximately $4 million to a bank account, which listed, as a
"d/b/a" of the accountholder, the name of an actual business
counterparty of Victim-1 ("Counterparty-1"), but which was
actually controlled by SAGIAO.  After SAGIAO received the
proceeds of BEC-1, SAGIAO transferred those proceeds, either
directly or through intermediaries, to bank accounts controlled
by PENEUETA, JACKSON, FITTEN, and COTTRELL, each of which
listed, as a "d/b/a" of the accountholder, a name that closely
resembled the name of a real company that the accountholder was
not affiliated with.

        b.    In the second BEC Scheme ("BEC-2"), a health
services organization ("Victim-2") was induced to send
approximately $500,000 to a bank account, which listed, as a
"d/b/a" of the accountholder, a name that closely resembled the
name of a food company ("Counterparty-2"), but which was
actually controlled by OBIKA.  After OBIKA received the proceeds
of BEC-2, OBIKA transferred those proceeds, either directly or
through intermediaries, to bank accounts controlled by SAGIAO,
FITTEN, URO, ANYAOGU, and BASS, each of which listed, as a
"d/b/a" of the accountholder, a name that closely resembled the
name of a real company that the accountholder was not affiliated
with.  Proceeds of BEC-2 were also sent to AHAIWE, who deposited
the funds in a bank account in the name of a deceased person
(the "Decedent") that AHAIWE controlled.

        10.    From at least in or about June 2019 up to and
including the present, BRITT JACKSON, the defendant,

participated in and received proceeds from an online romance fraud scheme, in which a man residing in Pennsylvania ("Victim-3") was induced to send over $130,000 based on false representations (the "Romance Fraud").

11. From at least in or about October 2018 up to and including at least in or about October 2018, NDUKWE ANYAOGU, the defendant, participated in and received approximately $380,000 in proceeds from an email compromise scheme involving a law firm in Fiji, which were intended for a woman residing in California ("Victim-4") (the "Fiji Fraud").

<u>BEC-1</u>

12. Based on my review of reports prepared by other law enforcement officers, including documents referenced in those reports and documents provided to me by Victim-1,[1] I have learned, among other things, the following:

a. Victim-1 is a Chinese technology company. Victim-1 regularly conducts business with Counterparty-1, which is a corporate affiliate of a major U.S. technology company.

b. On or about March 27, 2019, an employee of Victim-1 ("Employee-1") received an email purporting to be from an employee in the procurement department of Victim-1's parent company ("Employee-2"). This email--which was sent from the same email address that Employee-2 had previously used to correspond with Employee-1 about business--falsely stated that the payee information for Counterparty-1 had changed and that the new bank account for Counterparty-1 was a certain bank account purportedly held at a bank in New York, New York ("Phony Counterparty-1 Account").[2] In fact, Employee-2 did not send this email and was not aware of the email at the time it was sent.[3]

---

[1] Certain documents I have reviewed in the course of this investigation were originally written in Chinese. I have reviewed and relied upon English translations of those documents provided by Victim-1.

[2] Based on my review of bank records, I have learned that, in reality, Phony Counterparty-1 Account is held at a bank in California.

[3] Based on my training and experience, I believe that Employee-2's email account was hacked and that an attacker sent

     c.   On or about April 1, 2019, Employee-2 sent an email to Employee-1 directing Employee-1 to make a payment of $4,088,412 to Counterparty-1 in connection with a business transaction. This was a legitimate email from Employee-2.

     d.   On or about April 2, 2019, Employee-1 wired $4,088,412 to Phony Counterparty-1 Account, in reliance on the March 27, 2019 email.

     e.   On or about April 16, 2019, Counterparty-1 advised Victim-1 that Phony Counterparty-1 Account did not belong to Counterparty-1 or any of its corporate affiliates.

     13.   Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance and certain open source materials, I have learned, among other things, the following:

     a.   Phony Counterparty-1 Account was opened in person by JACOB SAGIAO, the defendant, on or about March 19, 2019, and lists, as a "d/b/a" of SAGIAO (the accountholder), a name that closely resembles the name of Counterparty-1, although, as discussed above, Phony Counterparty-1 Account did not belong to Counterparty-1 or any of its corporate affiliates.

     b.   On or about April 5, 2019, after receiving the $4,088,412 wire transfer from Victim-1, SAGIAO sent a wire transfer in the amount of $1,000,000 from Phony Counterparty-1 Account to a bank account held at a bank in the United Kingdom (the "U.K. Account"). This wire transfer was processed through a correspondent bank located in New York, New York.

     c.   On or about April 5, 2019, SAGIAO withdrew cashier's checks in the amounts of $250,000 and $290,000 from Phony Counterparty-1 Account. Bank surveillance shows that SAGIAO was the person who withdrew the cashier's checks.[4]

---

the March 27, 2019 email to Employee-1 purporting to be from Employee-2.

[4]   In the course of this investigation, I have obtained a photograph of SAGIAO from records maintained by the California Department of Motor Vehicles. Based on comparison with this

d.   On or about April 8, 2019, the $250,000 cashier's check that SAGIAO withdrew from Phony Counterparty-1 Account was deposited into a certain bank account ("Bank Account-1").  Bank Account-1 was opened in person by BRITT JACKSON, the defendant, on or about October 23, 2018, and lists, as a "d/b/a" of JACKSON (the accountholder), a name that closely resembles the name of a real company ("Company-1").  The cashier's check deposited into Bank Account-1 was made payable to Company-1 and bank surveillance shows that JACKSON was the person who deposited the check.[5]

i.   Company-1 is a Canadian company in the business of manufacturing tractors.  The transaction history in Bank Account-1 reflects no transactions that appear to relate to the legitimate business of Company-1.  After Bank Account-1 was opened on or about October 23, 2018, no transactions occurred until the deposit of $250,000 on or about April 8, 2019.

ii.   JACKSON, who lives in Georgia, has no known connection to Company-1.  The corporate address listed for Company-1 in account opening documents for Bank Account-1 is JACKSON's own personal address, as reflected on his driver's license.  When JACKSON opened Bank Account-1, he described Company-1 as a sole proprietorship of which he was the owner, whereas the real Company-1 is a corporation.

iii.   On or about May 2, 2019, after the $250,000 cashier's check was deposited into Bank Account-1, JACKSON sent a wire, in the amount of $237,500, from Bank Account-1 to a bank account held at a bank in China.

e.   On or about April 8, 2019, the $290,000 cashier's check that SAGIAO withdrew from Phony Counterparty-1 Account was deposited into a certain bank account ("Bank Account-2").  Bank Account-2 was opened in person by MARYLYNN PENEUETA, the defendant, on or about March 15, 2019, and lists,

---

photograph, I believe that the person in the bank surveillance is SAGIAO.

[5]   In the course of this investigation, I have obtained a photograph of JACKSON from records maintained by the Georgia Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is JACKSON.

as a "d/b/a" of PENEUETA (the accountholder), a name that closely resembles the name of a real company ("Company-2"). The cashier's check deposited into Bank Account-2 was made payable to Company-2.

      i.     Based on public social media posts and open source information, I have learned that PENEUETA is the wife or romantic partner of SAGIAO and that they reside together.

      ii.    Company-2 is a New York company in the business of manufacturing concrete products. The transaction history in Bank Account-2 reflects no transactions that appear to relate to the legitimate business of Company-2.

      iii.   PENEUETA, who lives in California, has no known connection to Company-2. The corporate address listed for Company-2 in the account opening documents for Bank Account-2 is PENEUETA's own personal address, as reflected on her driver's license. When PENEUETA opened Bank Account-2, she described Company-2 as a sole proprietorship of which she was the owner, whereas the real Company-2 is a corporation.

      iv.   After the $290,000 cashier's check was deposited into Bank Account-2, on or about April 22, 2019, PENEUETA sent a wire, in the amount of $88,950, from Bank Account-2 to a bank account held at a bank in Canada. On or about April 23, 2019, PENEUETA sent another wire, in the amount of $88,950, from Bank Account-2 to a bank account held at a bank in China. Each of these wire transfers was processed through a correspondent bank located in New York, New York.

      f.   On or about April 22, 2019, after receiving the $290,000 cashier's check from SAGIAO, PENEUETA purchased the following five cashier's checks using funds from Bank Account-2:

      i.     A cashier's check in the amount of $16,000 ("PENEUETA Check-1");

      ii.    A cashier's check in the amount of $16,000 ("PENEUETA Check-2");

      iii.   A cashier's check in the amount of $15,615 ("PENEUETA Check-3");

      iv.   A cashier's check in the amount of $16,645 ("PENEUETA Check-4"); and

   v. A cashier's check in the amount of $20,000 ("PENEUETA Check-5").

   g. On or about April 23, 2019, PENEUETA Check-1 and PENEUETA Check-2, totaling $32,000, were deposited into a certain bank account ("Bank Account-3"). Bank Account-3 was opened in person by DONTAE COTTRELL, the defendant, on or about April 12, 2019, and lists, as a "d/b/a" of COTTRELL (the accountholder), a name that closely resembles the name of a real company ("Company-3"). Both PENEUETA Check-1 and PENEUETA Check-2 were made payable to Company-3. Account opening documents show that COTTRELL's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[6]

   i. Company-3 is a major California company in the business of manufacturing power tools. The transaction history in Bank Account-3 reflects no transactions that appear to relate to the legitimate business of Company-3.

   ii. COTTRELL, who lives in California, has no known connection to Company-3. The corporate address listed for Company-3 in the account opening documents for Bank Account-3 is COTTRELL's own personal address, as reflected on his driver's license. When COTTRELL opened Bank Account-3, he described Company-3 as a sole proprietorship of which he was the owner.

   iii. Between in or about April 23, 2019 and April 26, 2019, COTTRELL made cash withdrawals in the total amount of $32,000 from Bank Account-3.

   h. On or about April 26, 2019 and April 29, 2019, PENEUETA Check-3 and PENEUETA Check-4, respectively, totaling $32,260, were deposited into a certain bank account ("Bank Account-4"). Bank Account-4 was opened in person by JOSHUA FITTEN, the defendant, on or about March 21, 2019, and

---

[6] Bank records for Bank Account-3 list the driver's license number that was provided to the bank at the time of account opening. In the course of this investigation, I have obtained a photograph of COTTRELL, maintained by the California Department of Motor Vehicles, linked to the same driver's license number. The photograph on the driver's license matches a photograph that COTTRELL submitted as part of a passport application in 2012.

lists, as a "d/b/a" of FITTEN (the accountholder), a name that
closely resembles the name of a real company ("Company-4").
Both PENEUETA Check-3 and PENEUETA Check-4 were made payable to
Company-4.  Account opening documents show that FITTEN's
driver's license, bearing his photograph, was provided to the
bank at the time of account opening.[7]

        i.    Company-4 is a Taiwanese company in the
business of manufacturing hand tools and industrial hardware.
The transaction history in Bank Account-4 reflects no
transactions that appear to relate to the legitimate business of
Company-4.

        ii.    FITTEN, who lives in California, has no
known connection to Company-4.  The corporate address listed for
Company-4 in account opening documents for Bank Account-4 is
FITTEN's own personal address, as reflected on his credit
reports.  When FITTEN opened Bank Account-4, he described
Company-4 as a sole proprietorship of which he was the owner,
whereas the real Company-4 is a corporation.

        iii.    Between April 26, 2019 and April 30,
2019, FITTEN made cash withdrawals in the total amount of
$32,800 from Bank Account-4.

        i.    On or about April 22, 2019, PENEUETA Check-
5, in the amount of $20,000, was deposited into a certain bank
account ("Bank Account-5").  Bank Account-5 was opened in person
by JACOB SAGIAO, the defendant, on or about January 31, 2019,
and lists, as a "d/b/a" of SAGIAO (the accountholder), a name
that closely resembles the name of a real company ("Company-5").
PENEUETA Check-5 was made payable to Company-5.

---

[7]    Bank records for Bank Account-4 list the driver's license
number that was provided to the bank at the time of account
opening.  As described further below in paragraph 16(f), the
same driver's license number was provided when FITTEN opened
another account, Bank Account-8 (as defined below).  Bank
records for Bank Account-8 include a photocopy of that driver's
license, which includes a photograph of FITTEN.  Furthermore,
FITTEN provided the same phone number for both Bank Account-4
and Bank Account-8.  Based on telephone subscriber records I
have reviewed in the course of this investigation, the
subscriber of that phone number is FITTEN.

        i.    Company-5 is a Serbian company in the military defense business.  The transaction history in Bank Account-5 reflects no transactions that appear to relate to the legitimate business of Company-5.

        ii.    SAGIAO, who lives in California, has no known connection to Company-5.  The corporate address listed for Company-5 in account opening documents for Bank Account-5 is SAGIAO's own personal address, as reflected on his driver's license.  When SAGIAO opened Bank Account-5, he described Company-5 as a sole proprietorship of which he was the owner, whereas the real Company-5 is a corporation.

        iii.    On or about May 1, 2019, SAGIAO made a cash withdrawal in the amount of $14,000 from Bank Account-5.

BEC-2

14.  Based on my discussions with other law enforcement officers and my review of reports prepared by other law enforcement officers, I have learned, among other things, the following:

        a.    Victim-2 is a health services organization in Sint Maarten.

        b.    On or about March 4, 2019, Victim-2's finance department received an email from the email account of the Chief Financial Officer of Victim-2 (the "CFO") directing a $500,000 wire transfer to a certain bank account in Brooklyn, New York ("Phony Counterparty-2 Account") for the benefit of Counterparty-2, which is a real company.  In fact, the CFO did not send this email and was not aware of this email at the time it was sent.

        c.    On or about March 6, 2019, Victim-2's finance department wired $499,900 ($500,000 minus a $100 wire fee) to Phony Counterparty-2 Account, in reliance on the March 4, 2019 email.  This wire transfer was processed through a correspondent bank located in New York, New York.

        d.    On or about March 11, 2019, the CFO was alerted to the wire transfer and learned that his email account had been compromised.

15.  Based on my discussion with a representative of Counterpary-2, I have learned, among other things, that Phony

12

Counterparty-2 Account did not belong to Counterparty-2 or any of its corporate affiliates.

16. Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance and certain open source materials, I have learned, among other things, the following:

a. Phony Counterparty-2 Account was opened in person by ARINZE OBIKA, the defendant, on or about November 16, 2018, and lists, as a "d/b/a" of OBIKA (the accountholder), a name that closely resembles the name of Counterparty-2, although, as discussed above, Phony Counterparty-2 Account did not belong to Counterparty-2 or any of its corporate affiliates. Account opening documents show that OBIKA's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[8]

b. On or about March 8, 2019, after receiving the $499,900 wire transfer from Victim-2, OBIKA withdrew $485,974 from Phony Counterparty-2 Account and purchased the following five cashier's checks:

i. A cashier's check in the amount of $50,988 ("OBIKA Check-1");

ii. A cashier's check in the amount of $34,993 ("OBIKA Check-2");

iii. A cashier's check in the amount of $34,993 ("OBIKA Check-3");

iv. A cashier's check in the amount of $196,000 ("OBIKA Check-4"); and

v. A cashier's check in the amount of $169,000 ("OBIKA Check-5").

c. Between on or about March 8, 2019 and March 11, 2019, OBIKA made cash withdrawals in the total amount of $13,800 from Phony Counterparty-2 Account.

---

[8] A photocopy of OBIKA's driver's license was maintained in the bank records for Phony Counterparty-2 Account.

13

   d. On or about March 8, 2019, OBIKA Check-1, in the amount of $50,988, was deposited into a certain bank account ("Bank Account-6").  Bank Account-6 was opened in person by DAVID URO, the defendant, on or about December 11, 2018, and lists, as a "d/b/a" of URO (the accountholder), a name that closely resembles the name of a real company ("Company-6"). OBIKA Check-1 was made payable to Company-6.  Account opening documents show that URO's Nigerian passport and United States Permanent Resident card, both bearing his photograph, were provided to the bank at the time of account opening.[9]

    i. Company-6 is a British company in the commercial aerospace, defense, and security businesses.  The transaction history in Bank Account-6 reflects no transactions that appear to relate to the legitimate business of Company-6.

    ii. URO, who lives in New York, has no known connection to Company-6.  The corporate address listed for Company-6 in account opening documents for Bank Account-6 is URO's own personal address, as reflected on his driver's license.  This same address was listed by ARINZE OBIKA, the defendant, as the address for the accountholder of Phony Counterparty-2 Account.  When URO opened Bank Account-6, he described Company-6 as a sole proprietorship of which he was the owner, whereas the real Company-6 is a corporation.

    iii. Between in or about March 12, 2019 and March 13, 2019, URO made cash withdrawals in the total amount of $24,000 from Bank Account-8.

   e. On or about March 11, 2019, OBIKA Check-2, in the amount of $34,993, was deposited into a certain bank account ("Bank Account-7").  Bank Account-7 was opened in person by JACOB SAGIAO, the defendant, on or about February 28, 2019, and lists, as a "d/b/a" of SAGIAO (the accountholder), a name that closely resembles the name of a real company ("Company-7"). OBIKA Check-2 was made payable to Company-7.  Account opening documents show that SAGIAO's driver's license, bearing his

---

[9] Photocopies of the Nigerian passport and Permanent Resident card were maintained in the bank records for Bank Account-6.

photograph, and his Social Security Card were provided to the
bank at the time of account opening.[10]

      i.   Company-7 is a Dutch company that
appears to be in the zoo logistics business.  The transaction
history in Bank Account-7 reflects no transactions that appear
to relate to the legitimate business of Company-7.

      ii.   SAGIAO, who lives in California, has no
known connection to Company-7.  The corporate address listed for
Company-7 in the account opening documents for Bank Account-7 is
SAGIAO's own personal address, as reflected on his driver's
license.  When SAGIAO opened Bank Account-7, he described
Company-7 as a sole proprietorship of which he was the owner,
whereas the real Company-7 is a corporation.

      iii.   On or about March 12, 2019, SAGIAO made
cash withdrawals in the total amount of $34,000 from Bank
Account-7.

      f.   On or about March 11, 2019, OBIKA Check-3,
in the amount of $34,993, was deposited into a certain bank
account ("Bank Account-8").  Bank Account-8 was opened in person
by JOSHUA FITTEN, the defendant, on or about January 9, 2019,
and lists, as a "d/b/a" of FITTEN (the accountholder), a name
that closely resembles the name of a real company ("Company-8").
OBIKA Check-3 was made payable to Company-8.  Account opening
documents show that FITTEN's driver's license, bearing his
photograph, and his Social Security Card were provided to the
bank at the time of account opening.[11]

      i.   According to records maintained by the
British government, Company-8 is a British company that was
dissolved in or about October 2016 and then re-formed in or
about March 12, 2019.  The transaction history in Bank Account-8
reflects no transactions that appear to relate to the legitimate
business of Company-8.

---

[10]   Photocopies of SAGIAO's driver's license and Social
Security Card were maintained in the bank records for Bank
Account-7.

[11]   Photocopies of FITTEN's driver's license and Social
Security Card were maintained in the bank records for Bank
Account-8.

          ii.    FITTEN, who lives in California, has no known connection to Company-8.  The corporate address listed for Company-8 in the account opening documents for Bank Account-8 is FITTEN's own personal address, as reflected on his credit reports.

          iii.    On or about March 11, 2019, the same day that OBIKA Check-3, in the amount of $34,993, was deposited into Bank Account-8, FITTEN made a cash withdrawal in the amount of $34,400 from Bank Account-8.

          g.    On or about March 11, 2019, OBIKA Check-4, in the amount of $196,000 was deposited into a certain bank account ("Bank Account-9").  Bank Account-9 was opened in person by NDUKWE ANYAOGU, the defendant, on or about December 27, 2019, and lists, as a "d/b/a" of ANYAOGU (the accountholder), the name of a shell company ("Company-9").  OBIKA Check-4 was made payable to Company-9.  Account opening documents show that ANYAOGU's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[12]

          i.    Company-9 was organized by ANYAOGU as a Georgia LLC in or about August 22, 2018.  Based on my review of open source material and public databases, Company-9 conducts no real business.  The corporate address listed for Company-9 in account opening documents for Bank Account-9 for Company-9 is ANYAOGU's own personal address, as reflected on his driver's license.  The building at that address is a residential apartment building.

          ii.    On or about March 20, 2019, ANYAOGU attempted to wire $191,500 from Bank Account-9 to the U.K. Account, which is the same account to which JACOB SAGIAO, the defendant, wired $1,000,000 of the proceeds of BEC-1, as described above in paragraph 13(b).  The requested wire transfer was declined by the bank where Bank Account-9 was held.  On or about March 21, 2019, ANYAOGU withdrew the balance of Bank Account-9, in the amount of $193,539.85, as a cashier's check made out to Company-9.

          h.    On or about March 14, 2019, OBIKA Check-5, in the amount of $169,000, was deposited into a certain bank account ("Bank Account-10").  Bank Account-10 was opened in

---

[12]    A photocopy of ANYAOGU's driver's license was maintained in the bank records for Bank Account-9.

person by HERMAN BASS, the defendant, on or about March 14, 2019, and lists, as a "d/b/a" of BASS (the accountholder), a name that closely resembles the name of a real company ("Company-10").  OBIKA Check-5 was made payable to Company-10.

       i.    Company-10 is a California company in the business of valve engineering and manufacturing.  The transaction history in Bank Account-10 reflects no transactions that appear to relate to the legitimate business of Company-10.

       ii.    BASS, who lives in California, has no known connection to Company-10.  The corporate address for Company-10 listed in the account opening documents for Bank Account-10 is not the address listed on the real Company-10's website as Company-10's corporate address.  When BASS opened Bank Account-10, he described Company-10 as a sole proprietorship of which he was the owner.

       iii.    On or about March 23, 2019 and March 25, 2019, BASS wrote two personal checks from Bank Account-10 made payable to the Decedent, a person who, according to public records, died on or about January 3, 2019 (the "Decedent Checks").  Bank surveillance shows BASS accessing Bank Account-10 at a teller window on or about March 26, 2019.[13]

       i.    On or about March 25 and 26, 2019, the Decedent Checks, totaling $100,000, were deposited into a certain bank account in the name of the Decedent ("Bank Account-11").  On or about April 5, 2019, a check in the amount of $27,250 drawn on Bank Account-11 was deposited at another bank account in the name of the Decedent ("Bank Account-12").  For the following reasons, I believe that, at the time the $27,250 check was deposited, Bank Account-12 was under the control of VICTOR AHAIWE, the defendant:

       i.    AHAIWE also maintained an account in his own name (the "AHAIWE Account") at the same bank where Bank Account-12 is held.

---

[13]   In the course of this investigation, I have obtained a photograph of BASS from records maintained by the California Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is BASS.

ii.    The address listed for the Decedent in
Bank Account-12 is the same as the address listed for AHAIWE in
the AHAIWE Account.  Based on my review of phone subscriber
records, I have learned that the phone number listed for the
Decedent on Bank Account-12 is subscribed to AHAIWE's home
address.  Based on my review of email subscriber records, I have
learned that the subscriber of the email account listed for the
Decedent on Bank Account-12 is AHAIWE.

iii.    Bank surveillance shows that, on or
about March 6, 2019, AHAIWE accessed Bank Account-12 from an
ATM.[14]  Bank records show that AHAIWE used the debit card for
Bank Account-12, in the name of the Decedent, in order to access
the ATM.

<u>Online Romance Fraud</u>

17.    Based on my discussions with Victim-3 and
documents provided to me by Victim-3, along with certain open
source materials, I have learned, among other things, the
following:

a.    Victim-3 resides in Pennsylvania.

b.    In or about June 2019, Victim-3 met an
individual who identified himself as "Joseph Cordoba" on an
online dating website.  After initially meeting on the website,
Victim-3 and "Joseph Cordoba" continued their communications
through email and by phone.

c.    In the course of communications with Victim-
3, "Joseph Cordoba" stated, in sum and substance, that he owned
an interior design business (the "Phony Design Business") in
Connecticut.  Based on my review of open source and law
enforcement databases, the Phony Design Business does not exist.

d.    In the course of email communications with
Victim-3, "Joseph Cordoba" purported to live at an address in
Connecticut.  Based on my review of open source material, that
address does not exist.

---

[14]    In the course of this investigation, I have obtained a
photograph of AHAIWE from records maintained by the California
Department of Motor Vehicles.  Based on comparison with this
photograph, I believe that the person in the bank surveillance
is AHAIWE.

        e.   In or about July 2019, "Joseph Cordoba" called Victim-3 and stated, in sum and substance, that he needed to pay import taxes on furniture for the Phony Design Business to an importer (the "Phony Importer").  In reliance on this representation and subsequent phone and email communications with "Joseph Cordoba," on or about July 11, 2019, Victim-3 mailed a $10,000 check payable to the Phony Importer, addressed to BRITT JACKSON, the defendant.  "Joseph Cordoba" had previously described JACKSON as a representative of the Phony Importer.

        f.   In or about July 2019, "Joseph Cordoba," in phone and email communications, told Victim-3, in sum and substance, that he needed money to pay for the shipping of furniture from the Phony Importer to the Phony Design Business.  "Joseph Cordoba" agreed to treat as a loan any money that Victim-3 sent for this purpose, and "Joseph Cordoba" executed a promissory note.  In reliance on these representations, Victim-3 initiated the following wires:

        i.   On or about July 16, 2019, Victim-3 wired $16,500 to JACKSON at a bank account in Georgia provided by "Joseph Cordoba" ("Bank Account-13").  This wire was processed through a bank located in New York, New York.

        ii.   On or about July 24, 2019, Victim-3 wired an additional $30,000 to JACKSON at Bank Account-13.  This wire was processed through a bank located in New York, New York.

        g.   In or about August 2019, "Joseph Cordoba," in phone and email communications, told Victim-3, in sum and substance, that he needed money to pay for fees related to the estate of the father of "Joseph Cordoba," which "Joseph Cordoba" claimed was worth millions of U.S. dollars.  "Joseph Cordoba" agreed to treat as a loan any money that Victim-3 sent for this purpose, and "Joseph Cordoba" executed a promissory note.  In reliance on these communications, on or about August 21, 2019, Victim-3 wired $80,000 to a bank account in Hong Kong, China.

        h.   In or about the summer of 2019, "Joseph Cordoba" and Victim-3 made plans to meet for a date in Manhattan.  In anticipation of that meeting, Victim-3 made travel arrangements, including a hotel reservation.  Shortly before the planned meeting, "Joseph Cordoba" cancelled.  Victim-3 has never seen "Joseph Cordoba" in person.

i.   "Joseph Cordoba" has not repaid any of the promissory notes that he executed in order to induce Victim-3 to send money.

j.   "Joseph Cordoba" continues to communicate with Victim-3 through the present.

18.   Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance, I have learned, among other things, the following:

a.   Bank Account-13 was opened in person in or about November 19, 2018 by BRITT JACKSON, the defendant.

b.   On or about July 16, 2019, the same day that Victim-3 wired $16,500 to Bank Account-13, JACKSON withdrew cash from Bank Account-13 at an ATM.  Bank surveillance shows that JACKSON was the person who accessed the ATM.[15]

c.   On or about July 18, 2019, JACKSON withdrew $17,200 from Bank Account-13 in the form of a cashier's check. Bank surveillance shows that JACKSON withdrew the funds at a teller window.

d.   On or about July 26, 2019--shortly after receiving the $30,000 wire from Victim-3 on or about July 24, 2019--JACKSON wired $23,965 to a bank account held at a bank in Canada, which is the same bank account that, on or about April 22, 2019, received a $88,950 wire from MARYLYNN PENEUETA, the defendant, in connection with BEC-1, as described above in paragraph 13(e)(iv).

Fiji Fraud

19.   Based on my discussions with other law enforcement officers and my review of reports prepared by other law enforcement officers, I have learned, among other things, the following:

---

[15]   In the course of this investigation, I have obtained a photograph of JACKSON from records maintained by the Georgia Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is JACKSON.

a.   In or about 2018, Victim-4, a woman who resides in California, was the intended beneficiary of certain proceeds from the sale of land in Fiji (the "Estate Proceeds"). A law firm in Fiji ("the Fiji Firm") was responsible for sending the Estate Proceeds--which were in the total approximate amount of $380,000--to Victim-4.

b.   On or about October 2, 2018, the Fiji Firm received an email purportedly sent by Victim-4's daughter (who had authority to handle Victim-4's affairs with the Fiji Firm), directing the Fiji Firm to send the Estate Proceeds to a certain bank account in Georgia ("Bank Account-14"). In fact, the email was sent by a third-party, and Bank Account-14 did not belong to Victim-4. The October 2, 2018 email listed, as the address for the accountholder of Bank Account-14, the home address of NDUKWE ANYAOGU, the defendant.

c.   One or about October 4, 2018 and October 9, 2019, the Fiji Firm sent the Estate Proceeds, by two wire transfers, each in the approximate amount of $194,000, to Bank Account-14.

20.   Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, I have learned, among other things, the following:

a.   The two wire transfers from the Fiji Firm to Bank Account-14 were processed through a correspondent bank located in New York, New York.

b.   Bank Account-14 was opened in person by NDUKWE ANYAOGU, the defendant, on or about October 1, 2018, and lists, as a "d/b/a" of ANYAOGU (the accountholder), the name of Victim-4. The phone number and email address listed on Bank Account-14 are ANYAOGU's phone number and email address. Account opening documents show that ANYAOGU's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[16]

---

[16]   Bank records for Bank Account-14 list the driver's license number that was provided to the bank at the time of account opening. As described above at paragraph 16(g), the same driver's license number was provided when ANYAOGU opened another account, Bank Account-9. Bank records for Bank Account-9

c.   After Bank Account-14 received the two wires intended for Victim-4 from the Fiji Firm, ANYAOGU withdrew cashier's checks and initiated international wire transfers from Bank Account-14.  For example:

i.   On or about October 5, 2018, ANYAOGU withdrew $40,000 from Bank Account-14 in the form of a cashier's check payable to another person.  Also on or about October 5, 2018, ANYAOGU wired $97,000 from Bank Account-14 to a bank account held at a bank in Turkey.  This wire was processed through a correspondent bank in New York, New York.

ii.   On or about October 12, 2018, ANYAOGU withdrew funds from Bank Account-14 to fund a $50,000 cashier's check to another entity controlled by ANYAOGU and a $40,000 cashier's check to another person.  Also on October 12, 2018, ANYAOGU sent two international wires, in the amounts of $194,000 and $10,000 from Bank Account-14 to bank accounts held at banks outside of the United States.  Each of these international wires was processed through a correspondent bank located in New York, New York.

21.   Based on my review of bank records and publicly available documents, I have learned that each of the banks where Phony Counterparty-1 Account, Phony Counterparty-2 Account, Bank Account-1, Bank Account-2, Bank Account-3, Bank Account-4, Bank Account-5, Bank Account-6, Bank Account-7, Bank Account-8, Bank Account-9, Bank Account-10, Bank Account-11, Bank Account-12, Bank Account-13, Bank Account-14, and the AHAIWE Account were opened is insured by the Federal Deposit Insurance Corporation.

22.   Based on my training and experience, individuals who engage in criminal activity--including wire fraud schemes like BEC-1, BEC-2, the Romance Fraud, and the Fiji Fraud--often take steps to conceal the source of proceeds of that criminal activity, that is, to launder the proceeds.  The methods used to launder such criminal proceeds can include, as relevant here, creating new bank accounts in the names of entities and transferring money between those accounts as cash or as cashier's checks.  In cases where the underlying criminal activity occurred outside the United States but the proceeds are

include a photocopy of that driver's license, which contains a photograph of ANYAOGU.

sent to the United States to be laundered, the proceeds are
frequently sent back overseas after they have been laundered.

WHEREFORE, I respectfully request that warrants be
issued for the arrests of JACOB SAGIAO, MARYLYNN PENEUETA, BRITT
JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE
ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the
defendants, and that they be arrested, and imprisoned or bailed,
as the case may be.

_____
JARED EANNUCCI
Task Force Officer
United States Attorney's Office for the
Southern District of New York

Sworn to before me this
11 day of February, 2020

_____
THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

23